# COURT OF APPEALS OF VIRGINIA

## Record No. 2013-24-1

JAMES DAVID HAZELWOOD

v.

COMMONWEALTH OF VIRGINIA

Present: Judges AtLee, Chaney and Bernhard

Argued at Norfolk, Virginia

Opinion Issued June 9, 2026

**FROM THE CIRCUIT COURT OF THE CITY OF HAMPTON**
Michael A. Gaten, Judge

Marisa E. Mancini, Assistant Public Defender (Brooke N. Carroll, Assistant Public Defender, on briefs), for appellant.

Kelly L. Sturman, Assistant Attorney General (Jason S. Miyares,[1] Attorney General, on brief), for appellee.

**PUBLISHED OPINION BY**
**<u>JUDGE DAVID BERNHARD</u>**

James David Hazelwood appeals the circuit court's denial of his motion to strike two counts of obscene sexual display (Code § 18.2-387.1), and three counts of violation of a protective order (Code § 18.2-60.4). Hazelwood argues the evidence was insufficient to prove he engaged in explicitly simulated acts of masturbation, contending that conviction requires conduct that a reasonable observer would perceive as an unambiguous imitation of the physical act of masturbation, not merely a clothed grab or hostile gesture involving the genital area. He further asserts the evidence was insufficient to prove his conduct was obscene and, as to the protective order convictions, insufficient to prove his conduct amounted to "contact."

---

[1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

This Court reverses and dismisses the obscene sexual display convictions. Under Code § 18.2-387.1, to constitute an "explicitly simulated" act of masturbation, the conduct must, as perceived by a reasonable observer, unambiguously imitate the physical act of masturbation. The word "simulated" sets the threshold: the conduct must assume the appearance of masturbation itself, not merely suggest or allude to it. The word "explicitly" demands more: the simulation must be clear and unambiguous, not merely crude or hostile. These words, read in combination, require conduct that a reasonable observer could not plausibly mistake for anything other than an imitation of masturbation.

In determining whether that standard is met when the charged conduct involves clothed contact with the genital area, this Court considers the following objective indicia:[2] (1) a sustained, repetitive, or stroking motion of the hand over or upon the genital area, as distinguished from a single grab, shake, or thrust; (2) verbal conduct, sounds, or facial expressions consistent with sexual arousal or solicitation rather than hostility or contempt; and/or (3) circumstances that foreclose a reasonably plausible nonprurient explanation, such as an established adversarial relationship between the defendant and the target. For purposes of this indicium, an adversarial relationship is "established" only where the record contains objective evidence of documented prior conflict, such as a prior protective order, prior criminal complaint, prior judicial proceeding, or a sustained course of hostile conduct reflected in the testimony of percipient witnesses. A defendant's post-hoc assertion of antipathy toward the target, uncorroborated by the record, is insufficient to invoke this indicium. Together, these indicia are evidentiary guideposts, not

---

[2] This Court emphasizes that the three indicia set out above are not intended to suggest that hostile conduct and prurient conduct are mutually exclusive categories. A defendant's conduct may be hostile in manner and prurient in character simultaneously. The indicia are guideposts for determining whether the physical act, viewed objectively, rises to the level of an unambiguous simulation of masturbation, not whether the conduct was sexual in nature in any broader sense.

additional elements of the offense; no single indicium is alone dispositive or exclusive of consideration of other probative evidence; and the third indicium operates as a contextual lens, not a categorical defense.  For ease of reference, this Court refers to these as the first indicium (the character of the hand movement over the genital area), the second indicium (accompanying verbal conduct, sounds, or facial expressions consistent with sexual arousal or solicitation), and the third indicium (relational context, including any documented adversarial history that bears on whether a reasonable observer would perceive a prurient rather than non-sexual hostile purpose).  The weight accorded the third indicium is therefore proportional to the degree to which the first two indicia leave the character of the act in genuine equipoise, and where the first or second indicium is strongly satisfied, as when the record establishes a sustained, repetitive stroking motion or verbal conduct plainly consistent with sexual arousal, the existence of a prior adversarial relationship does not, standing alone, negate the explicitly simulated character of the conduct.

The question here is whether, taken together, the evidence excludes a reasonable hypothesis of a hostile, nonprurient gesture beyond a reasonable doubt.  We hold the evidence was insufficient to support the two obscene sexual display convictions.  No reasonable observer would have perceived Hazelwood's conduct, a brief, clothed grab-and-shake directed at a known adversary in a context of longstanding hostile confrontation, as an unambiguous imitation of masturbation, actual or feigned; the convictions therefore fail the "explicitly simulated" requirement.  The evidence was also insufficient to establish that the conduct, considered as a whole, had as its dominant theme an appeal to the prurient interest in sex, as the obscenity element independently requires.

This Court, however, affirms the convictions for violation of a protective order.  "Contact" under the protective order statutes at issue encompasses both direct and indirect contacts intentionally aimed by the respondent at the petitioner.  The evidence raised factual questions for the jury, the jury resolved those questions, and its determinations were not plainly wrong.

Accordingly, we may not disturb the circuit court's judgment convicting Hazelwood of the protective order violations.

## BACKGROUND

In August and September of 2019, summonses were issued charging Hazelwood with two violations of Code § 18.2-387.1 (actual or explicitly simulated acts of masturbation), one violation of Code § 18.2-603 (stalking), and three violations of Code § 18.2-60.4 (violation of protective orders). A warrant was issued in April of 2020 for a fourth violation of a protective order.[3] Hazelwood was originally tried in the Hampton General District Court. He appealed the convictions to the Hampton Circuit Court where a trial de novo was held on November 6, 2024. Hazelwood now appeals his five convictions entered by the circuit court, which were based on incidents occurring on May 25, 2019, June 10, 2019, July 22, 2019, September 2, 2019, and April 15, 2020.

Collectively, these incidents involved Hazelwood, Jessica Mattson, Charles Double, and Melody Double. At the time of the incidents, Hazelwood lived on East Cummings Avenue.[4] The Double siblings[5] both lived near Hazelwood's house at the time of the incidents. Both siblings had had some issues with Hazelwood leading up to the original institution of this case. Melody testified that she and Hazelwood "have been neighbors since [she] was a child."

---

[3] Hazelwood was acquitted of one protective order violation charge and of the stalking charge.

[4] Mattson, Charles's girlfriend, testified that in 2019, Hazelwood lived on East Curry Street in the City of Hampton. It appears that Mattson misspoke because East Curry Street does not exist in Hampton, although North Curry Street does exist in Hampton. Additionally, based on the map admitted into evidence and on the protective orders, it appears that Hazelwood actually lived on East Cummings Avenue.

[5] The siblings are referred to by their first names, Charles and Melody, in this opinion.

I. Overview of the Incidents

    A. May 25, 2019

Melody testified that on May 25, 2019, she was driving on East Cummings Avenue and "had to stop in front of the house directly next to" Hazelwood's house "because there's a stop sign." "[A]ll of a sudden, [she] heard somebody yell, [']Hey, girl,['] . . . followed by unintelligible words." Melody did not hear what the person was yelling other than "Hey, girl." When asked who the person yelling was, Melody responded, "It was James Hazelwood on his porch as I passed by in front of his house." "[A]s [she] looked over, he was waving with one hand, like gesturing as he yelled. And the other, he was touching his penis and shaking it up and down through his clothes. It was not visible." She testified that she was about 30 to 40 feet away from Hazelwood. Melody noticed Hazelwood "[b]ecause of him yelling and gesturing for [her]." After hearing Hazelwood say "Hey, girl," Melody looked toward him "and saw what he was doing and [she] just looked away."

When asked for more detail as to what Hazelwood was doing, Melody responded, "He was grabbing his genital area, clearly holding something through his pants, and shaking up and down aggressively" while "[s]taring at me." Melody testified that when this was happening, she felt "[a]larmed," "[k]ind of scared," and "[f]reaked out." On cross examination, Melody testified that the car windows were down, and she did not have the radio on. She was not able to hear what Hazelwood said other than "Hey, girl," and she did not hear him make sexual statements to her. She stated that this incident occurred around noon. Melody did not recall other neighbors being out. Hazelwood did not place his hands inside of his pants, and he never physically exposed himself. She testified that she looked away "probably after about two seconds."

### B.  June 10, 2019

Melody testified that on June 10, 2019, she was driving on North Curry Avenue.  Her car windows were down, and the radio was off.  As she was driving, she saw Hazelwood run out onto the sidewalk and grab "his penis or genitals and shak[e] up and down while yelling."  She further clarified that she saw Hazelwood "grabbing at his penis and shaking, like aggressively."  He made this gesture over his clothing, and he never put his hand inside his pants.  Melody looked away "pretty quickly."  She did not know what Hazelwood yelled other than "Hey" and "just sped up and kept going."  Hazelwood "was looking at [her] while he ran onto the sidewalk."  Melody testified this incident made her feel "alarmed and freaked out."  She testified this incident occurred during the day and that she could not recall whether any other people were around.

### C.  July 22, 2019

On July 8, 2019, the Hampton General District Court issued a preliminary protective order against Hazelwood, stating that Hazelwood "shall not commit acts of violence, force, or threat or criminal offenses that may result in injury to person or property" and that he "shall have no contact of any kind with the Petitioner," Charles Double.  The preliminary protective order required Hazelwood to appear in court for the full protective order hearing.  On July 22, 2019, while Charles was waiting to get into the Hampton General District Court for the hearing on the full protective order, Hazelwood walked past Charles and said "bitch."  Charles testified that at the time, he "was with Melody and the rest of [his] family and other witnesses as well."  Charles was about 10 to 12 feet away from Hazelwood.  On cross-examination, Charles stated that before Hazelwood said "bitch," Charles "observed him talking to himself or muttering to himself."  When asked, "And then so in passing, you hear the word bitch?," Charles responded, "No.  That wasn't it.  This was directed directly at me."  Charles stated that Hazelwood was looking at him but affirmed that he did not refer to Charles by name or make any specific threats towards Charles.  The Hampton

General District Court issued a full protective order at the July 22, 2019 hearing, and that order was in effect until July 21, 2021. The protective order again stated that Hazelwood "shall have no contact of any kind with" Charles.

### D. September 2, 2019[6]

On September 2, 2019, Charles was driving on North Willard Avenue with Mattson in the passenger seat around 10:45 a.m. Charles, who was on the way to work, had to make a U-turn to go back to his house. On the way to his house, Charles observed Hazelwood as he "ran out into his yard, both middle fingers in the air, screaming obscenities in front of his home on Cummings." Charles was not able to make out any specific words Hazelwood yelled, and the vehicle was "[w]ithin a hundred feet" of Hazelwood. Charles testified he did not recall anybody else present on the street at that time. Mattson testified she saw

> Hazelwood running in his yard, like he was running toward us from his yard, and he had both his arms in the air with middle fingers at us. We had the windows down and it sounded like he was shouting at us, but I can't discern what he said specifically. I just know it was aimed towards us.

She further testified that Hazelwood "had direct eye contact with Charlie and I."

### E. April 15, 2020

While the protective order was still in effect, Charles was in his neighbor's yard speaking with the neighbor on April 15, 2020. "Hazelwood was standing between his house and his neighbor to the left, and he had his hands in his pants, . . . yelling . . . [']Hey, fuck boy,['] with his hands in his pants, grabbing on himself." Charles's attention was drawn to Hazelwood by "[h]im yelling, [']Hey, fuck boy.[']" Charles testified that Hazelwood was looking "[i]n my direction."

---

[6] In August of 2019, Mattson also obtained a two-year protective order prohibiting Hazelwood from having any contact with Mattson or engaging in criminal offenses that may injure Mattson. The conviction for violation of a protective order based on the September 2, 2019 incident, however, was only for the protective order taken out by Charles.

Charles was "about 120 feet away" from Hazelwood, and he did not hear Hazelwood say anything else.

   II.  Motion to Strike and Sentencing

   After the Commonwealth rested, Hazelwood moved to strike all of the charges.  As to the simulated masturbation charges, Hazelwood argued that those charges require a showing of mimicked "stimulation of the genitals with the hand for sexual pleasure."  He asserted there was no evidence that he was actually sexually aroused or that he engaged in the act for sexual pleasure.  Further, Hazelwood argued grabbing is not enough for masturbation, which "require[s] more of the stimulation of himself."  Hazelwood also asserted the Commonwealth failed to prove that he "intentionally [or obscenely] engaged in this act as simulated masturbation."

   As to the protective order violations, Hazelwood argued the Commonwealth failed to prove that he "intentionally and knowingly attempted to contact or did contact Charles Double."  With respect to the July 22, 2019 incident, Hazelwood and Charles were at the courthouse where both were legally obligated to be for the protective order hearing.  Hazelwood only said the word "bitch" in passing and made no indication that the word was directed at Charles.  There was no evidence showing that Hazelwood intended for Charles to hear the comment or that he was aware that Charles could hear him.  With respect to the September 2, 2019 incident, Hazelwood argued there was no evidence showing that he knew who was in the vehicle or that the gesture was directed at someone in particular.  Finally, regarding the April 15, 2020 incident, the record contains no evidence Hazelwood's statement was directed at Charles rather than at the neighbor with whom Charles was speaking.

   The Commonwealth countered that, as to the simulated masturbation charges, there is evidence that Hazelwood drew Melody's attention to him by yelling and then proceeded to grab his crotch to keep her attention.  With respect to the July 22, 2019 protective order violation, the

Commonwealth noted that Charles had specifically testified that the "bitch" comment was made directly to him. As to the September 2, 2019 incident, the Commonwealth noted Mattson's testimony that Hazelwood was looking directly at her and Charles when making the gesture. Finally, with respect to the April 15, 2020 incident, the Commonwealth argued that Charles's testimony indicated that Hazelwood was looking at Charles after saying "Hey, fuck boy."

The circuit court denied the motion to strike. Hazelwood did not present any evidence in his defense and instead renewed his motion to strike, incorporating the arguments from his first motion to strike. The circuit court denied the renewed motion to strike, noting that whether Hazelwood's behavior underlying the simulated masturbation charges was simply a "rude gesture" as opposed to simulated masturbation was a question for the jury.

The jury found Hazelwood guilty of two charges of simulating masturbation in public based on the May 25, 2019 and June 10, 2019 incidents. Additionally, the jury found Hazelwood guilty of three charges of violation of a protective order taken out by Charles based on the July 22, 2019, September 2, 2019, and April 15, 2020 incidents. On November 6, 2024, the Hampton Circuit Court sentenced Hazelwood to 12 months of incarceration with 12 months suspended on each of the simulating masturbation convictions, 12 months with 10 months suspended on the violation of a protective order charge based on the July 22, 2019 incident, 12 months with 8 months suspended on the violation of a protective order charge based on the September 2, 2019 incident, and 12 months with 6 months suspended on the violation of a protective order charge based on the April 15, 2020 incident. Hazelwood thus received a total of 12 months of active incarceration. On each conviction, Hazelwood was also placed under supervision and ordered to complete a mental health assessment, follow any recommended treatment, and complete an anger management program. He now appeals the denial of the motion to strike.

ANALYSIS

*I. Standard of Review*

"A motion to strike challenges whether the evidence is sufficient to submit the case to the jury." *Lawlor v. Commonwealth*, 285 Va. 187, 223 (2013). "Whether the evidence adduced is sufficient to prove each of [the statutory] elements is a factual finding, which will not be set aside on appeal unless it is plainly wrong." *Linnon v. Commonwealth*, 287 Va. 92, 98 (2014) (quoting *Lawlor*, 285 Va. at 223-24). Applying the inquiry, this Court "review[s] the evidence in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Commonwealth v. Cady*, 300 Va. 325, 329 (2021) (quoting *Commonwealth v. Hudson*, 265 Va. 505, 514 (2003)). This Court "discard[s] the evidence of the accused in conflict with that of the Commonwealth, and regard[s] as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Id.* (quoting *Commonwealth v. Perkins*, 295 Va. 323, 323-24 (2018)). "This Court 'does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Smith v. Commonwealth*, 296 Va. 450, 460 (2018) (quoting *Perkins*, 295 Va. at 327). Instead, "the relevant question is, upon review of the evidence in the light most favorable to the prosecution, whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Perkins*, 295 Va. at 327).

On appeal, this Court "may neither find facts nor draw inferences that favor the losing party that the factfinder did not." *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024). The question of "[w]hat the elements of the offense are" is one of statutory interpretation, which this Court reviews de novo. *Linnon*, 287 Va. at 98 (quoting *Lawlor*, 285 Va. at 223). "When construing a statute, our 'primary objective,' as always, is 'to ascertain and give effect to legislative intent' from the words of the statute." *Turner v. Commonwealth*, 295 Va. 104, 108

(2018) (quoting *Lawlor*, 285 Va. at 236). This Court "give[s] those words 'their ordinary meaning, unless it is apparent that the legislative intent is otherwise.'" *Id.* (quoting *Phelps v. Commonwealth*, 275 Va. 139, 142 (2008)). Moreover, this Court "assume[s] that the legislature chose, with care, the words it used when it enacted the relevant statute." *Alger v. Commonwealth*, 267 Va. 255, 261 (2004) (quoting *Barr v. Town & Country Props., Inc.*, 240 Va. 292, 295 (1990)).

"[T]he burden is on the Commonwealth to prove every essential element of the offense beyond a reasonable doubt." *Washington v. Commonwealth*, 273 Va. 619, 623 (2007) (quoting *Dowdy v. Commonwealth*, 220 Va. 114, 116 (1979)). The factfinder "is entitled to consider all of the evidence, including circumstantial evidence, . . . in reaching its determination." *Commonwealth v. Moseley*, 293 Va. 455, 463 (2017) (quoting *Hudson*, 265 Va. at 512-13). Yet, "[i]n order for inferences to amount to evidence they must be inferences based on facts that are proved, and not inferences based on other inferences." *Smith v. Commonwealth*, 185 Va. 800, 819 (1946). "[I]t is not sufficient that the evidence creates a suspicion or probability of guilt; but it must go further and exclude every reasonable hypothesis except that of guilt." *Id.* at 820 (quoting *Sutherland v. Commonwealth*, 171 Va. 485, 494 (1938)). "This 'reasonable hypothesis of innocence' principle is 'simply another way of stating that the Commonwealth has the burden of proof beyond a reasonable doubt.'" *Commonwealth v. Wilkerson*, 304 Va. 92, 101-02 (2025) (quoting *Moseley*, 293 Va. at 463). That formulation is thus not a burden distinct from proof beyond a reasonable doubt; it is the practical expression of that burden in cases built on circumstantial inference, and it compels reversal when the record supplies no evidentiary basis to reject a reasonable hypothesis of innocence beyond a reasonable doubt; it does not require acquittal whenever innocence is merely supposable. *Commonwealth v. Cuffee*, ___ Va. ___, ___ (Apr. 16, 2026). That principle operates symmetrically: it demands affirmance when the

- 11 -

jury's rejection of a hypothesis of innocence rests on an evidentiary basis, *see id.* at ___; it demands reversal when the jury's rejection rests on arbitrary disregard of uncontroverted evidence. *Id.* at ___. Where the Court considers the factfinder's rejection of a hypothesis of innocence, it does not reweigh the evidence but rather enforces the Commonwealth's burden of proof. *See Commonwealth v. Richerson*, ___ Va. ___, ___ (Apr. 23, 2026). In this way, *Cuffee* and *Richerson* calibrate appellate review to the quality of the evidentiary record.

The de novo review of what the statutory elements require is further guided by additional principles of construction. "Where possible, a statute should be construed with a view toward harmonizing it with other statutes." *Newton v. Commonwealth*, 21 Va. App. 86, 90 (1995) (quoting *Morris v. Morris*, 4 Va. App. 539, 543 (1987)). In keeping with that principle, "[w]hen . . . multiple legislative enactments share 'a common purpose or [are part of] the same general plan[,]' we 'consider [them] as *in pari materia*' and attempt to reconcile them." *Anderson v. Clarke*, 302 Va. 400, 409 (2023) (third, fourth, and fifth alterations in original) (quoting *Morgan v. Commonwealth*, 301 Va. 476, 481 (2022)). "[O]ther Code sections using the same phraseology may be consulted in determining the meaning of a statute." *Newton*, 21 Va. App. at 90 (quoting *Branch v. Commonwealth*, 14 Va. App. 836, 839 (1992)); *see also Barson v. Commonwealth*, 284 Va. 67, 74 (2012) ("[W]hen the legislature uses the same term in separate statutes, that term has the same meaning in each unless the General Assembly indicates to the contrary." (quoting *Jenkins v. Mehra*, 281 Va. 37, 48 (2011))). In addition, penal statutes "must be strictly construed with regard to any reasonable ambiguity," but "we will not apply 'an unreasonably restrictive interpretation of the statute' that would subvert the legislative intent expressed therein." *Turner*, 295 Va. at 109 (quoting *Alger*, 267 Va. at 259); *see also Harris v. Commonwealth*, 83 Va. App. 571, 581 (2025).

When the Commonwealth's proof of a statutory element rests on circumstantial evidence, the standard governing circumstantial evidence becomes an integral part of the sufficiency analysis. *Taylor v. Commonwealth*, 61 Va. App. 13, 30 (2012). The appellate inquiry therefore focuses not on whether a hypothesis of innocence was thinkable but on whether the factfinder's rejection of that hypothesis was grounded in the evidence or lacked an evidentiary basis in the record. *Cuffee*, ___ Va. at ___. Treating any conceivable possibility of innocence as dispositive would improperly transform the Commonwealth's burden into proof beyond all doubt, which Virginia law does not require. *Id.* at ___. Circumstantial proof must be "consistent with guilt and inconsistent with innocence." *Commonwealth v. Smith*, 259 Va. 780, 783 (2000) (quoting *LaPrade v. Commonwealth*, 191 Va. 410, 418 (1950)). The Commonwealth, however, "need only exclude reasonable hypotheses of innocence that flow from the evidence, not those that spring from the imagination of the defendant." *Hamilton v. Commonwealth*, 16 Va. App. 751, 755 (1993); *accord Cuffee*, ___ Va. at ___ ("the principle applies only to *reasonable* hypotheses"). Nevertheless, "the reasonable hypothesis formulation 'does not leave the jury at liberty to guess, and where a fact is equally susceptible of two interpretations, one of which is consistent with the innocence of the accused, they cannot arbitrarily adopt that interpretation which incriminates him.'" *Cuffee*, ___ Va. at ___ (quoting *Burton v. Commonwealth*, 108 Va. 892, 899 (1908)). When, however, the jury has a reasonable evidentiary basis for rejecting the hypothesis of innocence, that principle affords the defendant no relief. *Id.* at ___; *Smith*, 185 Va. at 820; *Moody v. Commonwealth*, 28 Va. App. 702, 706 (1998).

These principles govern the statutory analysis that follows.

*II. Explicitly Simulated Acts of Masturbation*

Under his first assignment of error, Hazelwood asserts the evidence was insufficient to support the convictions for obscene sexual display. Looking at common dictionary definitions, Hazelwood asserts "[m]asturbation is generally defined as the touching or stimulation of one's own genitals for the purpose of sexual stimulation or gratification." As such, to be convicted of an explicitly simulated act of masturbation, there must be evidence that the defendant simulated both the physical manipulation of his genitals and the purpose of sexual gratification. Such an act must be "explicit," meaning "without any ambiguity or vagueness behind the act or its purpose." Because "Hazelwood never made any sexual statements or any sexual noises . . . suggestive of actual or feigned sexual gratification," "never exposed his penis, pretended to ejaculate, or otherwise gave any indication that he was physically aroused," the evidence was insufficient to convict him of obscene sexual display for either incident. Hazelwood concedes that genital exposure is not required, but maintains that any physical manipulation must be accompanied by apparent sexual purpose, relying on § 18.2-390(3)'s reference to "physical contact in an act of apparent sexual stimulation or gratification."

The Commonwealth responds that Code § 18.2-390(3) is instructive in interpreting the phrase "explicitly simulated acts of masturbation," as it defines "sexual conduct" as "actual or explicitly simulated acts of masturbation . . . or physical contact in an act of apparent sexual stimulation or gratification with a *person's clothed or unclothed genitals* . . . ." According to the Commonwealth, the language in Code §§ 18.2-390(3) and 18.2-387.1 demonstrates that the conduct prohibited under § 18.2-387.1 is the "intentional and obscene movement of the genitals while eliciting attention from others rather than unintentional, brief contact that a person might make to their groin to scratch an itch or fix a zipper." Exposure of the genitals is not required, nor is a defendant required to "become gratified by his behavior because [the Code] penalizes the

obscene and explicit simulation of masturbation, when done in public for the purpose of being seen by others."

Under Code § 18.2-387.1, "[a]ny person who, while in any public place where others are present, intending that he be seen by others, intentionally and obscenely as defined in § 18.2-372, engages in actual or explicitly simulated acts of masturbation, is guilty of a Class 1 misdemeanor." It appears that most, if not all, cases addressing this statute involve actual masturbation as opposed to explicitly simulated acts of masturbation, and those cases did not define "masturbation." *See Harris*, 83 Va. App. at 577, 589 (holding that "prosecution under Code § 18.2-387.1 requires proof of multiple acts [of actual or explicitly simulated masturbation] to support multiple convictions" and reversing one of two convictions for the same conduct where two women observed defendant who was naked and who "turned toward them and stroked his penis 'vigorously' while making eye contact with each woman"); *Johnson v. Commonwealth*, 75 Va. App. 475, 478 (2022) (affirming conviction under Code § 18.2-387.1 where librarian looked through window of defendant's cell and saw him "actively stroking his [exposed] erect penis while looking directly at her").

Turning to the definition of "explicitly simulated acts of masturbation," this Court looks to the plain meaning of the phrase. The word "simulate" means "to give or assume the appearance or effect of often with the intent to . . . imitate." *Simulate*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/simulate (last visited May 7, 2026); *see also simulation*, *Black's Law Dictionary* 1669 (12th ed. 2024) ("An assumption of an appearance that is feigned, false, or deceptive."). That definition carries an inherent threshold: the conduct must assume the appearance of the act itself, not merely suggest or allude to it. "Explicitly" means "clearly and without any vagueness or ambiguity," *Explicitly*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/explicitly (last visited May 7, 2026), and is not mere surplusage, *Alger*, 267 Va. at 261; its inclusion demands that the simulation be clear and

- 15 -

unambiguous.  "Masturbation" means "erotic stimulation especially of the genital organs commonly resulting in orgasm and achieved by manual or other bodily contact."  *Masturbation*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/masturbation (last visited May 7, 2026).  Code § 18.2-387.1 does not require genital exposure for conviction.  Read together, these terms require that a defendant, without ambiguity, imitate the physical act of masturbation itself—the manual stimulation of the genitals in a manner that a reasonable observer would perceive as an unambiguous imitation of that act, as distinguished from a crude, hostile, or indeterminate gesture that happens to involve the genital area.

This Court recognizes that a gesture directed at another person and involving the defendant's genitals may be simultaneously hostile in character and sexual in implication, and, indeed, that the hostility of such a gesture may derive in part from its degrading sexual connotation.  The analytical distinction drawn here is not that hostile conduct cannot also be sexual, but that the statute requires the conduct *unambiguously to simulate the physical act of masturbation itself*, not merely carry a sexual implication or offend on sexual grounds.  Where the sexual dimension of the conduct is inferential rather than explicit, the General Assembly has addressed that conduct elsewhere.  *See* Code § 18.2-390(3).  Clothed, transient contact with the genital area, without any objective indicia sufficient to exclude a reasonable nonprurient explanation, is insufficient to satisfy the explicitly simulated acts of masturbation requirement.  The threshold the General Assembly set in Code § 18.2-387.1 is higher, and it is that threshold, not the offensiveness of the act, that the evidence here fails to satisfy.  The statutory requirement that the defendant intend to be seen "by others" in a public place also informs the third indicium (relational context).  Where the conduct is directed at a specific known person rather than at the public generally, the pre-existing relationship between the defendant and that person is directly relevant to how a reasonable observer, situated in that person's position,

would perceive the act.  *See* Code § 18.2-387.1.  The third indicium thus draws its legitimacy not from judicial gloss but from the statute's own command that the reasonable-observer inquiry be conducted in the full context of the parties' circumstances and relationship.

Where the conduct admits of two equally plausible interpretations, one consistent with an explicit simulation and the other consistent with only a hostile and crude gesture toward a neighbor, the evidence does not prove the simulation was clear and without vagueness or ambiguity.  *See Smith*, 259 Va. at 783.  The evidence fails this unified standard.  Neither incident presented facts from which a reasonable observer would have perceived Hazelwood as masturbating, actually or feigned, or from which that observer could plausibly have concluded the conduct was anything other than a hostile gesture.  He was clothed throughout, the contact lasted approximately two seconds on one occasion and was similarly brief on the other, no sounds or statements consistent with sexual arousal accompanied either incident, and both incidents arose within a longstanding adversarial confrontation with a known neighbor.

The hostile-gesture hypothesis at issue here is not a speculative alternative conjured by the defense.  It flows directly from the testimony of the Commonwealth's own witnesses: a longstanding adversarial neighborhood relationship, a target toward whom Hazelwood harbored demonstrated animosity, conduct accompanied by no sexual statement or sound, and gestures only brief in observation.  Where the reasonable hypothesis of innocence arises from the Commonwealth's own uncontradicted evidence, not from speculation by the defense, and the concurrent circumstances point toward the non-prurient explanation rather than away from it, the record provides no evidentiary basis upon which a jury could reject that hypothesis without resorting to conjecture unsupported by the record.  *Cuffee*, ___ Va. at ___.  A hypothesis of innocence is reasonable precisely when it "flow[s] from the evidence itself," *Richerson*, ___ Va. at ___ (quoting *Turner*, 218 Va. at 148), and here it flowed directly from the testimony of the

Commonwealth's own witnesses, uncontradicted at every point. Because the record supplied no evidentiary basis on which to reject that hypothesis beyond a reasonable doubt, the evidence was insufficient to sustain the convictions.

The structure of Code § 18.2-390(3) confirms this reading. That section defines "sexual conduct" in relevant part as "actual or *explicitly* simulated acts of masturbation . . . *or* physical contact in an act of *apparent* sexual stimulation or gratification with a person's clothed or unclothed genitals." Code § 18.2-390(3) (emphases added). The General Assembly purposely used "or" to separate these two categories. *See Murphy v. Commonwealth*, 277 Va. 221, 226 (2009) ("We consider that language in its entirety, rather than by isolating particular words or phrases."). Had the legislature intended that any contact with clothed genitals could satisfy the first category, the second category, "physical contact in an act of apparent sexual stimulation or gratification," would be wholly superfluous. This Court will not render any portion of a statute meaningless by construction. *See Alger*, 267 Va. at 261. The two clauses therefore reach categorically different conduct: the first requires an unambiguous physical imitation of masturbation itself; the second reaches the broader category of contact that merely appears sexual. The Commonwealth's theory, that aggressively grabbing and shaking clothed genitals while yelling at a passerby satisfies the "explicitly simulated masturbation" prong, conflates these distinct categories and renders the legislature's deliberate textual distinction without effect. The second category of Code § 18.2-390(3), "physical contact in an act of apparent sexual stimulation or gratification with a person's clothed or unclothed genitals," is precisely the provision that would reach conduct like Hazelwood's: aggressive clothed-genital contact that appears sexual. That the General Assembly placed such conduct in a lower-threshold "apparent" category, separate from and subordinate to "explicitly simulated masturbation," indicates the legislature understood this type of conduct as insufficient for the first category.

Code § 18.2-387.1 incorporated only the first category, the unambiguous physical simulation of masturbation itself. Accepting the Commonwealth's theory would eliminate the second category's independent work, and this Court will not reduce any part of a statute to surplusage. *See Alger*, 267 Va. at 261.

The difference between the two categories in Code § 18.2-390(3) also illuminates the *kind* of conduct the General Assembly understood "explicitly simulated masturbation" to reach. The second category, "physical contact in an act of apparent sexual stimulation or gratification," is the broader provision; it would capture a defendant who grabs his clothed genitals and moves his hand suggestively without fully simulating the act of masturbation. The first category requires more: the conduct must cross from apparently sexual to an unambiguous physical simulation of masturbation itself. That distinction confirms the General Assembly comprehended a spectrum of genital-touching conduct and deliberately placed explicitly simulated masturbation at the far end—the end occupied by conduct that a reasonable observer would perceive as an unambiguous physical imitation of the act of masturbation, not merely as crude or hostile genital contact. A single and brief aggressive grab-and-shake directed at a known adversary, unaccompanied by any indicator of sexual arousal, falls at the other end of that spectrum.

Applying the law to each of the two incidents charged, the Commonwealth failed to carry its evidentiary burden of proof beyond a reasonable doubt. *Washington*, 273 Va. at 623. As to the May 25, 2019 incident, the evidence established that Hazelwood yelled "Hey, girl," drew Melody's attention, then grabbed and shook his clothed genitals aggressively for approximately two seconds while staring at her. A preliminary clarification is warranted before applying the indicia to the specific facts. That Melody looked away quickly is not, and should not be read as, any reflection on her credibility or her experience as the target of the conduct.

- 19 -

Her reaction, to look away immediately upon encountering behavior she described as alarming and frightening, was entirely understandable. The relevance of the two-second duration is not the length of Melody's observation but what the uncontradicted evidence establishes about the nature of the act itself: a brief, clothed contact rather than the sustained, repetitive motion the physical imitation of masturbation would require. The brevity is a characteristic of Hazelwood's conduct, not of Melody's attention. Considering the three objective indicia of the explicitly simulated element, namely the nature of the hand motion, any accompanying sexualized words or sounds, and the parties' relational context, first, as to the character of the motion, Melody described an aggressive grab-and-shake observed for only two seconds. Second, as to accompanying communicative conduct, Hazelwood made no sexual statements, sounds, or facial expressions consistent with sexual arousal or solicitation. The only words Melody heard were "Hey, girl." Third, as to relational context, the uncontradicted evidence established a longstanding adversarial relationship between Hazelwood and Melody, which supplied an independent, non-prurient explanation for his conduct.

As to the June 10, 2019 incident, the evidence established that Hazelwood ran onto the sidewalk and grabbed and shook his clothed genitals aggressively while yelling as Melody drove past. She looked away "pretty quickly." Hazelwood's deliberate act of running onto the sidewalk in Melody's direction is equally consistent with a campaign of harassment and intimidation, a pattern well established by the parties' history, as with sexual solicitation. As with the May 25 incident, application of the same three indicia yields the same result: the motion was a brief, clothed grab-and-shake, not a sustained or stroking movement, no sexual statement or sound accompanied it, and the same adversarial relational context was present. The June 10 incident presents no fact that would distinguish it from the May 25 analysis in any

respect material to the hostile-gesture hypothesis, and the conviction based on that incident likewise lacks the evidentiary basis required to sustain it.

The Commonwealth argues that Hazelwood's deliberate attention-seeking, yelling to draw Melody's gaze before grabbing his genitals, establishes sexual purpose. The intent to be seen by others is, however, already an express element of Code § 18.2-387.1 and does not, standing alone, prove that the act being displayed was an explicit simulation of masturbation rather than a hostile gesture. *See Harris*, 83 Va. App. at 588-89. Nor do the confluence of circumstances, taken together, rescue Hazelwood's two convictions. As this Court has recognized, it is true that "the 'combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable mind irresistibly to a conclusion.'" *Ervin v. Commonwealth*, 57 Va. App. 495, 505 (2011) (quoting *Stamper v. Commonwealth*, 220 Va. 260, 273 (1979)). But this concept does not aid the Commonwealth here because the concurrent circumstances, namely clothed contact, a brief aggressive grab-and-shake, the total absence of sexual statement or sound, and an uncontradicted longstanding adversarial relationship, do not combine to exclude the hostile-gesture hypothesis. To the contrary, each of those circumstances is consistent with, and in several respects corroborative of, the non-prurient explanation. When concurrent circumstances point as readily toward innocence as toward guilt and the record supplies no evidentiary basis for preferring one interpretation over the other, any verdict of guilt would rest on a choice unsupported by the evidence rather than on proof beyond a reasonable doubt. *Cuffee*, ___ Va. at ___; *Smith*, 259 Va. at 783-84. That is the circumstance presented here. The same analytical framework that compelled affirmance in *Cuffee*, where the defendant's established professional familiarity with drug markets supplied a principled evidentiary basis to reject his claim of ignorance, compels reversal here, where no comparable evidentiary basis existed to reject the hostile-gesture hypothesis.

*III. Obscenity*

Hazelwood next argues that the evidence was insufficient for both convictions of obscene sexual display because the conduct described was not obscene as defined by Code § 18.2-372. There was no evidence Hazelwood "made any sexually charge[d] comments or invitations," made "any sexual noises or otherwise engage[d] in or mimic[ked] masturbation or sexual pleasure." According to Hazelwood, the evidence suggests his conduct was simply meant as a rude gesture to Melody, with whom he had issues. As such, the Commonwealth failed to prove that Hazelwood's conduct had as "its dominant theme or purpose an appeal to the prurient interest in sex." Code § 18.2-372.

The Commonwealth responds that the conduct was obscene, as it "was not customary or within the boundaries of community standards." Melody testified that Hazelwood's conduct made her feel "alarmed," "scared," and "freaked out" and that Hazelwood shouted to draw her attention to him "after which he proceeded to 'aggressively' shake and grab his genitals through his clothing or grab his genitals and move his hand up and down over his clothing."

Code § 18.2-387.1 requires that a person's conduct be obscene. The General Assembly has defined "obscene" as

> that which, considered as a whole, has as its dominant theme or purpose an appeal to the prurient interest in sex, that is, a shameful or morbid interest in nudity, sexual conduct, sexual excitement, excretory functions or products thereof or sadomasochistic abuse, and which goes substantially beyond customary limits of candor in description or representation of such matters and which, taken as a whole, does not have serious literary, artistic, political or scientific value.

Code § 18.2-372. "[W]hether a particular communication 'appeals to the "prurient interest"' and 'is "patently offensive"' are 'essentially questions of fact.'" *Moter v. Commonwealth*, 61 Va. App. 471, 480 (2013) (quoting *Miller v. California*, 413 U.S. 15, 30 (1973)). On appeal, "we do not ask 'whether the materials *are* obscene, but, rather, whether the materials *create a jury issue* as to

obscenity'—that is, whether a 'reasonable trier of fact' could come to that conclusion." *Id.* (quoting *Allman v. Commonwealth*, 43 Va. App. 104, 111-12 (2004)).

It does not appear that any case has addressed the obscenity element of Code § 18.2-387.1; however, there is case law analyzing the obscenity element for indecent exposure convictions. *See Copeland v. Commonwealth*, 31 Va. App. 512, 515 (2000) (holding that defendant's actions had the dominant purpose of an appeal to the prurient interest in sex where "[e]vidence [showed] that Copeland exposed his genitals, that he was visibly aroused, and that he was masturbating"); *Hart v. Commonwealth*, 18 Va. App. 77, 80 (1994) (affirming conviction as obscene where defendant, "[c]lad in a skimpy G-string which covered only his penis and anus, leaving his pubic area and buttocks exposed," told Faulk "he liked his velcro shorts because they 'gave easy access to women who wanted him'"); *Willis v. Commonwealth*, No. 0173-04-2, slip op. at 5, 2005 Va. App. LEXIS 58, at *8 (Feb. 8, 2005). Code §§ 18.2-387 and 18.2-387.1 are part of the same article of Title 18.2 and share the purpose of "protect[ing] individuals from witnessing the offensive conduct." *Barnes v. Commonwealth*, 61 Va. App. 495, 500 (2013). As statutes within the same article sharing a common purpose, they are properly considered in pari materia, and this Court accordingly applies the obscenity analysis from the indecent exposure cases to Code § 18.2-387.1 convictions. *Anderson*, 302 Va. at 409.

An important threshold governs this analysis: the question is not whether a rational factfinder could infer some sexual aspect from the conduct, but whether "a rational factfinder could find that appellant's conduct had, as its 'dominant theme or purpose an appeal to the prurient interest in sex.'" *A.M. v. Commonwealth*, No. 1150-12-4, slip op. at 5, 2013 Va. App. LEXIS 46, at *7-8 (Feb. 12, 2013) (emphases omitted) (quoting Code § 18.2-372).[7] Conduct can be

---

[7] Unpublished decisions of this and other courts are not binding precedent but may be cited as "informative" authority. Rule 5A:1(f).

"repulsive, disrespectful, and inappropriate in every way" and still not be "obscene" within the meaning of the statute. *Id.*, slip op. at 5, 2013 Va. App. LEXIS 46, at *7. The General Assembly enacted a narrow, specific definition in Code § 18.2-372, and this Court will not expand it to reach all crude or threatening conduct merely because the genitals are involved.

This Court has previously held that

> [t]he "obscenity" element of Code § 18.2-387 may be satisfied when: (1) the accused admits to possessing such intent, *Moses v. Commonwealth*, 45 Va. App. 357, 359-60 . . . (2005) (en banc); (2) the defendant is visibly aroused, *Morales v. Commonwealth*, 31 Va. App. 541, 543 . . . (2000); (3) the defendant engages in masturbatory behavior, *Copeland v. Commonwealth*, 31 Va. App. 512, 515 . . . (2000); or (4) in other circumstances when the totality of the circumstances supports an inference that the accused had as his dominant purpose a prurient interest in sex.

*A.M.*, slip op. at 4-8, 2013 Va. App. LEXIS 46, at *6-12 (italics omitted) (reversing indecent exposure conviction and holding that defendant's "'mooning' Ms. Keffer two minutes after he told her she had 'nice lips,'" while "repulsive, disrespectful, and inappropriate," was not obscene because the evidence did not demonstrate "that the *dominant* theme of his conduct was a prurient interest in sex"); *Romick v. Commonwealth*, No. 1580-12-4, slip op. at 3-5, 2013 Va. App. LEXIS 336, at *5-8 (Nov. 19, 2013) (holding that evidence was insufficient to prove defendant's actions had dominant purpose of prurient interest in sex where defendant "did not admit to having an obscene intent, he was not visibly aroused, . . . there was no evidence he was masturbating," and he "made no sexual statements . . . and . . . did not try to expose himself to a particular individual"); *Neice v. Commonwealth*, No. 1477-09-3, slip op. at 5-7, 2010 Va. App. LEXIS 231, at *8-12 (June 8, 2010) (holding that appellant's conduct was not obscene where "appellant's actions, albeit bizarre, were always done in a 'joking' manner," and "appellant did not exhibit the outward signs of sexual interest, such as visible arousal or masturbatory behavior").

Applying this analysis, the evidence was insufficient to prove that Hazelwood's actions were obscene. First, Hazelwood did not admit to a prurient intent. *See Moses*, 45 Va. App. at 360. Second, Hazelwood was not visibly aroused. Melody testified his penis was never visible and she observed no physical indicators of arousal. *See Morales*, 31 Va. App. at 543. Third, as discussed in the preceding section, the evidence was insufficient to prove Hazelwood engaged in masturbatory behavior. *See Copeland*, 31 Va. App. at 515. Fourth, the totality of the circumstances did not support the inference that Hazelwood's dominant purpose was a prurient interest in sex. He made no sexual statements, sexual invitations, or sounds suggestive of arousal, and the Commonwealth presented no evidence that Hazelwood had ever expressed sexual interest in Melody or made any sexual overture toward her.

The uncontradicted evidence instead showed a longstanding adversarial relationship between Hazelwood and both Double siblings predating these incidents. Because the Commonwealth's own uncontradicted witnesses established no basis from which a jury could, without resorting to conjecture, reject the hypothesis that Hazelwood's dominant purpose was intimidation and harassment rather than a prurient interest in sex, the evidence was insufficient to prove the obscenity element beyond a reasonable doubt. *Cuffee*, ___ Va. at ___; *Smith*, 185 Va. at 820; *Washington*, 273 Va. at 623. Where, as in *Cuffee*, the record supplies that basis, the verdict stands. Where, as here, it does not, the verdict cannot stand, because proof beyond a reasonable doubt requires more than selection between equally supported hypotheses. Indeed, consistent with this Court's observations in *A.M.* regarding similar conduct, Hazelwood's behavior was "repulsive, disrespectful, and inappropriate in every way—but not actually 'obscene' as the General Assembly has defined the meaning of that term in Code § 18.2-372." *A.M.*, slip op. at 5, 2013 Va. App. LEXIS 46, at *7. The evidence in the instant case was therefore insufficient to prove the obscenity element beyond a reasonable doubt.

We note that the simulation element and the obscenity element are independent and that satisfaction of one does not supply the other. Whether the two elements always travel together in cases involving actual masturbation with exposed genitals we need not decide today. In cases involving clothed-genital contact, however, the obscenity element performs its own independent work, requiring the factfinder to assess whether the dominant purpose of the conduct, viewed in its full context, was an appeal to the prurient interest in sex. Where, as here, both elements are independently unproven, each furnishes a separate and sufficient basis for reversal of the two Code § 18.2-387.1 convictions.

The line the General Assembly drew between Code § 18.2-387 and Code § 18.2-387.1 reflects precisely this distinction. Section 18.2-387 reaches intentional obscene displays, conduct a reasonable observer would find obscene. Section 18.2-387.1 reaches a narrower and more specific category: conduct a reasonable observer would perceive as actual or simulated masturbation. In circumstances where no reasonable observer would perceive the conduct as masturbation, actual or feigned, the behavior may, if at all, implicate other statutes such as Code § 18.2-387 rather than Code § 18.2-387.1; the choice of any such alternative charge lies within the Commonwealth's discretion, and we express no view on the applicability of Code § 18.2-387 to the facts of this case.

This Court is acutely aware that the conduct at issue, a man deliberately soliciting a woman's attention in order to confront her with an aggressive genital gesture, is harmful, degrading, and an experience that is unfortunately neither rare nor unfamiliar. Melody testified that it left her feeling alarmed, scared, and freaked out. That experience is real, and the harm it causes is not minimized by the statutory analysis this Court is required to conduct. The narrow question before this Court is not whether Hazelwood's conduct was offensive, threatening, or wrong, and it was all of these things, but whether it satisfied the specific and demanding

- 26 -

elements of Code § 18.2-387.1 as enacted. Nothing in this opinion diminishes Melody's credibility as a witness, the jury's factfinding on the protective order counts, or the legitimacy of the legislature's purpose in enacting this statute. The legislature enacted Code § 18.2-387.1 to shield persons in public places from being subjected to obscene sexual conduct without their consent, and that purpose is both legitimate and substantial. But the legislature chose language, "explicitly simulated acts of masturbation," combined with a separate obscenity element requiring a dominant prurient purpose, that limits the statute's reach to conduct unambiguously sexual in character, not merely crude, aggressive, or intimidating. Where the evidence leaves equally open a non-sexual hostile purpose grounded in a documented adversarial relationship, the statute, as written, does not reach the conduct. That is not this Court's policy choice. It is the legislature's choice, expressed through the specific words it selected, and this Court gives those words their due effect. If the General Assembly concludes that the statute's current language is insufficient to address all forms of offensive genital-touching directed at persons in public, the remedy lies with the legislature. *See Turner*, 295 Va. at 109.

Because the evidence was insufficient to establish either the explicitly simulated masturbation element or the obscenity element, reversal of both Code § 18.2-387.1 convictions is required on either ground independently. When a conviction is reversed for evidentiary insufficiency, the Double Jeopardy Clause bars retrial, and the proper remedy is dismissal rather than remand for a new trial. *See Parsons v. Commonwealth*, 32 Va. App. 576, 581 (2000). Accordingly, the two convictions under Code § 18.2-387.1 must be dismissed.

*IV. Contact*

Finally, Hazelwood argues the evidence was insufficient to support his three convictions for violation of a protective order, as the conduct did not amount to "contact" with Charles. Hazelwood contends that "the common theme [of definitions of "contact"] requires a

communication of some message from one person or object to another." With respect to the July 22, 2019 incident, Hazelwood argues he did not seek out Charles for the purpose of violating the preliminary protective order; rather, Hazelwood was legally required to be at the courthouse in the same vicinity as Charles for the hearing on the full protective order. Hazelwood was nearby Charles but did not address Charles by name nor indicate "that he was conveying a message specifically to" Charles. Additionally, Charles testified he was standing near other individuals at the time and that he had seen Hazelwood "talking to himself."

With respect to the September 2, 2019 incident, Hazelwood argues he was 100 feet away from Charles, who was not alone in the car. Hazelwood did not signal to the car's occupants "or direct his conduct explicitly towards [Charles] by name," and "there was never any testimony by [Charles] himself that Mr. Hazelwood was actually *looking* at [Charles] or in his direction." Additionally, "the gesture, without more, does not rise to the level of a communication. There was no testimony by [Charles] that he perceived a message or meaning from Mr. Hazelwood by virtue of him raising his middle fingers in the air." Lastly, during the April 15, 2020 incident, Hazelwood was standing about 120 feet away from Charles and did not signal to Charles by name, and Charles was standing right next to another individual.

The Commonwealth responds that *Green v. Commonwealth*, 72 Va. App. 193 (2020), and *Elliott v. Commonwealth*, 277 Va. 457 (2009), are instructive for defining "contact." The Commonwealth asserts that a "contact" "is an intentional act on the part of the defendant to 'pierce the barrier' of the protective order through direct or indirect communication." With respect to the July 22, 2019 incident, the Commonwealth asserts that the evidence showed Charles saw Hazelwood about 10 to 12 feet away, muttering to himself, and "Hazelwood then approached Charles and called him a 'bitch.'" Additionally, the Commonwealth argues the evidence showed that, with respect to the September 2, 2019 incident, Charles "was confronted

- 28 -

by a screaming Hazelwood who ran into the street towards Charles's vehicle and waved his middle fingers in Charles'[s] direction." "Charles testified that he did not see any other cars or people outside at the time." Finally, with respect to the April 15, 2020 incident, Hazelwood yelled, "Hey, fuck boy," to pull Charles's attention to him, which "prompted Charles to turn towards Hazelwood who then grabbed his [own] penis through his pants."

Under Code § 18.2-60.4, "[a]ny person who violates any provision of a protective order issued pursuant to § 19.2-152.8, 19.2-152.9, or 19.2-152.10 is guilty of a Class 1 misdemeanor." Code § 18.2-60.4(A). Code §§ 19.2-152.9 and 19.2-152.10 permit a court to issue preliminary and full protective orders prohibiting contact by the respondent with the petitioner. Code §§ 18.2-60.4, 19.2-152.9, and 19.2-152.10 do not define "contact," and the protective orders at issue did not specify any contact that was allowed.

As noted by the Commonwealth, *Green* and *Elliott* are instructive for defining "contact."[8] In *Elliott*, the Supreme Court of Virginia held that protective orders issued under Code § 16.1-279.1(A)(2) prohibiting "contact of any type" "would encompass a broad scope of actions and conduct, both intentional and unintentional." 277 Va. at 463-64. The Court went on to hold that "contacts are those acts by the respondent that intentionally pierce the protective barrier between the petitioner and the respondent fashioned by the protective order." *Id.* at 464. In *Elliott*, the respondent told the petitioner's mother that he would "'beat [them] to their . . . house.'" *Id.* at 460 (alterations in original). He then got in his vehicle and parked a block away

---

[8] These two cases discussed the meaning of "contact" for protective orders issued under a different statute than Code §§ 19.2-152.9 and 19.2-152.10. As noted previously, however, "other Code sections using the same phraseology may be consulted in determining the meaning of a statute." *Newton*, 21 Va. App. at 90 (quoting *Branch*, 14 Va. App. at 839). Likewise, caselaw interpreting those other code sections can be consulted. The statute under which the protective orders in *Green* and *Elliott* were issued and the protective order statutes at issue here all allow a court to issue a protective order prohibiting contacts by the respondent with the petitioner, and each statute is aimed at "protect[ing] the health and safety of the petitioner." Code §§ 16.1-253.1, 19.2-152.9, 19.2-152.10.

- 29 -

from the petitioner's house. *Id.* From the petitioner's house, the petitioner and two other witnesses observed the respondent standing near his car, "speaking on his mobile telephone and making various gestures including pointing at the Harvey residence." *Id.* 460-61. Ultimately, the Court reversed Elliott's conviction and stated,

> While he may have intentionally placed himself where he was openly visible to Harvey from her residence, it is undisputed that . . . he was located a block away from Harvey's residence, on a different street, and posed no threat of harm to the health and safety of Harvey. Accordingly, the evidence does not establish beyond a reasonable doubt that Elliott intentionally violated the condition of the protective order because the evidence is insufficient to establish that Elliott intended to visually communicate with Harvey, who was located at her residence one block away.

*Id.* at 464. *Elliott* thus required intent to communicate across the protective barrier. *Green* confirmed that indirect communication satisfies that requirement, provided it is deliberately aimed at the protected party.

In *Green*, this Court held that "'[c]ontact' . . . means 'an instance of establishing communication with someone.'" 72 Va. App. at 203 (quoting *Contact*, *Webster's Third New International Dictionary* (2002)). According to the *Green* Court, a "contact" can be either a direct or an indirect contact, as long as the respondent "intentionally directed the communication to" the petitioner. *Id.* at 204 (affirming conviction for violation of a protective order where respondent posted, "Someone tell my BM she was a bird for me" on Twitter, "reflect[ing] the appellant's intent to contact the victim through others-anyone who would do it," and where, after being notified of the existence of the post, the petitioner herself viewed the message on Twitter).

Consistent with the holdings in *Elliott* and *Green*, this Court holds that those "contacts" prohibited by protective orders issued pursuant to Code §§ 19.2-152.9 and 19.2-152.10 encompass both direct and indirect contacts that are intentionally aimed at the petitioner, i.e.,

acts that "intentionally pierce the protective barrier between the petitioner and the respondent fashioned by the protective order." *Elliott*, 277 Va. at 464; *Green*, 72 Va. App. at 204.

"The sole responsibility to determine the credibility of witnesses, the weight to be given to their testimony, and the inferences to be drawn from proven facts lies with the fact finder." *Lucas v. Commonwealth*, 75 Va. App. 334, 342 (2022) (quoting *Ragland v. Commonwealth*, 67 Va. App. 519, 529-30 (2017)). Appellate courts owe deference to matters of witness credibility. *Id.* at 343. "It is likewise within the province of the trier of fact to draw inferences from the proven evidence, and its inferences are binding so long as they are reasonable and justified." *Id.* Under this standard, the convictions based on the July 22, 2019, September 2, 2019, and April 15, 2020 incidents must be affirmed.

*A. The July 22, 2019 Incident*

Charles testified that while "waiting to get into the courthouse" for the hearing on the full protective order "with Melody and the rest of my family and other witnesses," "Hazelwood walked past me and called me a bitch." The jury in the instant case was entitled to accept Charles's testimony that Hazelwood directed the word "bitch" to Charles. That inference was further supported by the context: both men were present at the courthouse specifically for the hearing on the full protective order to follow the temporary protective order Hazelwood was charged with violating, making accidental or unintentional contact with Charles implausible. When asked how far away Hazelwood was from Charles, Charles stated, "I would say 10 feet, 12 feet." Counsel then asked, "And you said he was walking past you?" Charles responded, "I believe so. It was either -- it was in passing, one way or another. We were standing around waiting to get in the building. Whether I shifted one way or he did, I don't know."[9] He added

---

[9] Hazelwood and the Commonwealth appear to disagree on Hazelwood's proximity to Charles when he said the word "bitch." According to Hazelwood, the testimony was that Hazelwood was 10 to 12 feet away from Charles when he spoke, but the Commonwealth asserts

that his attention was drawn to Hazelwood "[b]ecause [Hazelwood] made a point to come up -- it was -- he came into view and called me a bitch." Before Hazelwood said the word "bitch," Charles observed Hazelwood "talking to himself or muttering to himself." When asked on cross-examination, "And then so in passing, you hear the word bitch?," Charles unequivocally testified, "No. That wasn't it. This was directed directly at me." Charles also affirmed that Hazelwood was looking at him, that Charles was standing with Melody, and that Hazelwood did not refer to Charles by name or make any other threats toward Charles. Taken together, Charles's unequivocal testimony that Hazelwood's remark was meant for him alone, the adversarial context of the protective order hearing, and Hazelwood's deliberate movement into Charles's view before speaking left the jury well within its province to conclude that Hazelwood intentionally directed the word "bitch" at Charles in violation of the protective order.

*B. The September 2, 2019 Incident*

Charles testified that he was driving to his house with Mattson in the passenger seat when Hazelwood "ran out into his yard, both middle fingers in the air, screaming obscenities in front of his home on Cummings." Charles was unable to hear what Hazelwood was yelling but noted that he was within 100 feet of Hazelwood and did not see anyone else on the street at the time. Mattson testified that she and Charles "saw James Hazelwood running towards us from his yard, and he had both his arms in the air with middle fingers at us." Mattson also noted that they had the car windows down and could not discern specifically what Hazelwood was screaming but knew "it was aimed towards us." Additionally, Mattson testified Hazelwood

_____

that Hazelwood was 10 to 12 feet away from Charles when Charles noticed him muttering to himself and then walked past Charles and said "bitch." It is unclear from the testimony whether Hazelwood was 10 to 12 feet away when Charles first observed him or when Hazelwood walked past Charles and said "bitch." In either reading, however, Hazelwood's proximity and deliberate orientation toward Charles are sufficient to support the jury's finding of intentional contact.

"had direct eye contact with Charles and I." On cross examination, Mattson stated that "[t]he entire interaction was between five and ten seconds in total." She also reaffirmed twice that Hazelwood made eye contact with both her and Charles. As the factfinder, the jury was entitled to accept both Charles's and Mattson's testimony and to find that Hazelwood directed his conduct toward Charles, given the history of disputes between Hazelwood and Charles.

In addition to arguing that the testimony was insufficient to prove that Hazelwood directed his conduct toward Charles, Hazelwood also argues that the gesture was not a communication because there was no evidence Charles perceived a message or a meaning by virtue of Hazelwood raising his middle fingers. The jury was entitled to find, based on common experience and the contentious history between Hazelwood and Charles, that Hazelwood's gesture conveyed an intentional offensive message to Charles and therefore pierced the protective barrier of the order.

### C. The April 15, 2020 Incident

Lastly, Charles testified that on April 15, 2020, he was in his neighbor's yard speaking with his neighbor when "Hazelwood was standing between his house and his neighbor to the left, and he had his hands in his pants, . . . yelling . . . [']Hey, fuck boy,['] with his hands in his pants, grabbing on himself." When Hazelwood yelled "Hey, fuck boy," Charles looked over at him. When asked where Hazelwood was looking during this incident, Charles responded, "[i]n my direction." On cross-examination, Charles testified Hazelwood's house was "about 120 feet away" and that Hazelwood was "most certainly" looking in Charles's direction.

Hazelwood argues it is unclear at whom his conduct was aimed, as he did not signal to Charles by name or otherwise identify him as the recipient. Whether Hazelwood's conduct was focused on Charles, his neighbor, or both was a question of fact for the jury to resolve. The jury was entitled to find, based on the contentious history between these parties and Hazelwood's

deliberate orientation and vocalization toward Charles, that his conduct was intentionally aimed at Charles and therefore pierced the protective barrier of the order.

CONCLUSION

For the foregoing reasons, this Court reverses and dismisses the two convictions for obscene sexual display under Code § 18.2-387.1 arising from the May 25, 2019 and June 10, 2019 incidents, and affirms the three convictions for violation of a protective order under Code § 18.2-60.4 arising from the July 22, 2019, September 2, 2019, and April 15, 2020 incidents.[10]

*Affirmed in part, reversed and dismissed in part, and remanded.*

---

[10] The trial court's final orders note that the date of Hazelwood's trial was November 7, 2024. The transcripts included in the appellate record, however, reflect that Hazelwood's trial took place on November 6, 2024, which is also the date that the aforementioned final orders were signed. Thus, it appears Hazelwood's trial occurred on November 6, 2024, not November 7, 2024. We remand the matter for the sole purpose of correcting this apparent clerical error. *See* Code § 8.01-428(B).